**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**CARLOS PEREZ,**

                             **Plaintiff,**                    **00-CV-1035(Sr)**

**v.**

**C.O. RADEMACHER, et al.,**

                             **Defendants.**

---

## DECISION AND ORDER

The parties have consented, pursuant to 28 U.S.C. § 636(c), to have the undersigned conduct all further proceedings in this case, including entry of judgment. Dkt. #46.

Plaintiff commenced this action *pro se*, pursuant to 42 U.S.C. § 1983, alleging that certain corrections officers ("C.O.'s"), in retaliation for filing of grievances, used excessive force against him during the course of a search of his cell in the Attica Correctional Facility ("Attica"), on January 10, 2000. Dkt. #54, Exh. A. Plaintiff alleges that the C.O.'s fabricated a misbehavior report accusing plaintiff of attempting to assault C.O. Seider with a razor-type weapon and that the he was denied due process at the resulting Tier III disciplinary hearing, which resulted in the imposition of two years confinement in the Special Housing Unit. Dkt. #54, Exh. A.

Currently before the Court is plaintiff's motion to strike defendants' answer or, in the alternative, prelude evidence and testimony. Dkt. #53. For the following reasons, plaintiff's motion is denied.

## BACKGROUND

Sgt. Corcoran declares that he regularly makes use of informants and receives tips from inmates on an almost daily basis.  Dkt. #61, ¶ 4.  On January 10, 2000, Sgt. Corcoran ordered a search of plaintiff's cell after he received a written note from an inmate telling him that plaintiff had a weapon.  Dkt. #54, Exh. L, pp.2-3; Dkt. #61, ¶ 5.  Sgt. Corcoran concedes that he no longer has the note, explaining

> I receive hundreds of such notes a year.  I have no reason to keep them, and keeping them would be not only cumbersome but perhaps dangerous for the inmates who write them.  Therefore, I routinely throw them out.

Dkt. #61, ¶ 6.   Although the note was not available for production during discovery, the New York State Department of Correctional Services ("DOCS"), did produce the inmate who wrote the note for deposition and he testified that he sent Sgt. Corcoran a note explaining that plaintiff

> had wanted me to hold a weapon for him.  He sent it to me, and it was in a sock with a note or something like that, saying he wanted me to hold this weapon for him. . . . I sent it back.  I didn't want it.  I didn't even look at the weapon.  It was like in a sock, and I sent it right back and that was it.

Dkt. #54, Exh. Q.  DOCS Directive No. 4910, regarding Control of & Search for Contraband, provides that an "unscheduled search of the living quarters of an inmate shall be conducted only when there is reasonable suspicion that contraband is contained in the housing unit."  Dkt. #54, Exh.

C.O. Seider testified that Sgt. Corcoran asked him to search plaintiff's cell for weapons or other contraband.  Dkt. #54, Exh. M, p.4.  According to Sgt. Corcoran's Use of Force/Assault on Staff Memo,

> At approximately 9:45, Officer Seider was sent to do a
> suspicion frisk of Inmate Perez [sic] . . . cell, per my order.
> When he reached the inmates [sic] cell and the door opened
> the inmate reached above the cell door and grabbed a razor
> with his right hand.  As the inmate attempted to raise the
> razor above his head Officer [Seider] grabbed hold of his
> right wrist area with both hands and wrestled the inmate to
> the floor, striking the bed and overturning a bucket of water
> flooding the cell.  Inmate continued to resist and Officer
> Fleming assisted with body holds to the inmates [sic] legs
> and the struggle ended.  Officer Seider recovered a ¾ " x
> 1 ¼ " razor type weapon from the floor, that had been
> dropped by the inmate during the struggle.  The weapon was
> bagged, tagged and photocopied and turned over to the
> Captains [sic] evidence locker.  The inmate was escorted
> over to the facility hospital via gurney.  The inmate appeared
> to have a seizure while being escorted off the company.
> The inmate was treated for multiple contusions to the face
> and back, a bruise to the right eyebrow and a small cut to
> the top of the head.  Inmate Perez was admitted to the
> facility hospital for observation.  Officer Seider had
> tenderness to the right shoulder and reported off duty due to
> his injuries.  Officer Fleming reported no injuries.  Officer
> Dixon later reported that the video tape was defective and
> no video footage was available.

Dkt. #54, Exh. E, pp.8-9.   C.O. Seider declares that he recovered the weapon, "a small

piece of metal sharpened on one edge," from the floor of plaintiff's cell and gave the

weapon to the Hall Captain to process so that he could go to the infirmary.  Dkt. #66, ¶¶

2 & 5.  The weapon was logged into the Captain's evidence locker, but was not

available for production during discovery.  Dkt. #67, p.6.  A photocopy of a weapon was

produced during discovery.  Dkt. #54, Exh. E, p.10.


> Plaintiff submitted a grievance dated January 14, 2000, alleging that

> On January 10, 2000 at approximately 9:45 a.m., two
> officers (D. Seider) and (D. Fleming) appeared at the front of
> my cell gate (B18-23 cell).  I was given an order by them to
> step out of my cell when it opens and they was gonna

> conduct a cell search on me.  As I was about to step out of
> my cell, Officer D. Seider ran in [sic] my cell real fast and
> grabbed me by my neck with his left hand and started
> punching me by my neck with his left hand and started
> punching me on my face and head until I lost
> consciousness.  He was punching me on my head real hard
> with his right hand, when I lost consciousness [sic] I was
> sent to the facility hospital on a stretcher, when I woked [sic]
> up at the hospital, I was told by the nurses that I had went
> into a seizure while being assaulted from the use of force by
> correction officers.  Also the nurses told me that corrections
> officers had told them that I tried to assault a correction
> officer with a razor.

Dkt. #54, Exh. C.  At his deposition, plaintiff testified that he remembered the C.O.'s

> took me out of my cell to the officer's station, and once they
> took me to the officer's station and after Officer Seider
> grabbed my head and slammed it into the company wall, I
> went to [sic] seizures, convulsions of the brain.  From there, I
> don't remember what happened . . . .

Dkt. #54, Exh. R, p.2.  Plaintiff recalled that C.O. Dixon was present with the video

recorder while the C.O.'s were assaulting him in his cell, stating:

> when they took me out of my cell, I seen him.  As soon as I
> stepped out of my cell, he was right there in front of me with
> a camera.  When they turned me around, he was there with
> a camera.  He was recording all the time.  When they took
> me to the officer's station, I seen him.  When Officer Seider
> turned me around to slam my head on the wall, that's the
> last I seen him.

Dkt. #54, Exh. R, pp.2-3.  Plaintiff denies ever being in possession of a razor or weapon

and denies reaching for the ledge over his cell door when the officers came to search

his cell.  Dkt. #54, Exh. R, p.5.


Sgt. Corcoran testified that it is standard policy that all Special Housing

Unit moves be videotaped.  Dkt. #54, Exh. L, p.7.  However, plaintiff's move

commenced before the video camera arrived.  Dkt. #54, Exh. L, p. 8.  C.O. Reginald

Dixon, a non-party to this action, declares that he was responsible for video taping plaintiff's move from B Block to the facility hospital, which he recalls as being "without incident."  Dkt. #54, Exh. S; Dkt. #62, ¶ ¶ 2, 6.  At the end of the move, C.O. Dixon recalls "that there was something unusual with the camera's tracking numbers, and when I backed up a few frames to view what was recorded, it did not appear that I had recorded anything."  Dkt. #62, ¶ 3.  C.O. Dixon reported the problem by noting "tape defective" on the video log.  Dkt. #54, Exh. S; Dkt. #62, ¶ 4.

Captain Bradt, a non-party to this action, declares that his review of the available records indicates that he reviewed the transport and noted "inmate on gurney move w/o incident" on the log.  Dkt. #54, Exh. S; Dkt. #60, ¶ 6.  Because he determined that the tape did not reveal any incident during the move, Captain Bradt declares that he would have returned the tape to the sally port of tapes available for recording and it would have been recorded over in fairly short order.  Dkt. #60, ¶ 8.  The sally port contained 31 compartments with a tape in each compartment so that the tape used for recording would correspond to the day of the month.  Dkt. #54, Exh. L, p.6.  If the tape was defective, it would have been destroyed and replaced.  Dkt. #60, ¶ 8.  Captain Bradt declares that none of the defendants "had any responsibility or authority for maintaining the tape, or for determining whether it was to be preserved or recycled."  Dkt. #60, ¶ 9.

Lt. Thomas Dixon, a non-party to this action, declares that he is responsible for the Captain's evidence locker at Attica, in which contraband, such as

drugs and weapons, are stored.  Dkt. #67, ¶ 4. Lt. Dixon further declares that

> In the normal course of business I, along with the
> contraband officer on duty, go through the weapons held in
> the evidence locker regularly, roughly on a quarterly basis.
> On those occasions if I determine that no one is being
> criminally prosecuted regarding a particular weapon and any
> disciplinary proceedings have concluded, the weapon is
> removed from the facility and destroyed.  No specific record
> is kept of this destruction.

Dkt. #67, ¶ 5.  Lt. Dixon also declares that "[o]nce a weapon is turned over to the

evidence locker, other correction personnel, including officers involved in its seizure,

are not involved in decisions regarding a weapon, including whether it is to be retained

or destroyed."  Dkt. #67, ¶ 7.


## DISCUSSION AND ANALYSIS

"Spoliation is the destruction or significant alteration of evidence, or the

failure to preserve property for another's use as evidence in pending or reasonably

foreseeable litigation."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d

Cir. 1999).   Even without a discovery order, a district court may impose sanctions for

spoliation, exercising its inherent power to control litigation."  *Id.*  The rationale for

sanctions "derives from the common sense notion that a party's destruction of evidence

which it has reason to believe may be used against it in litigation suggests that the

evidence was harmful to the party responsible for its destruction."  *Kronisch v. United

States*, 150 F.3d 112, 126 (2d Cir. 1998).  Sanctions, including dismissal of the lawsuit,

preclusion of evidence, or an adverse inference jury instruction, should be crafted to

serve the prophylactic, punitive, and remedial rationales of: (1) deterring parties from

engaging in spoliation; (2) placing the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restoring the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party. *Id.* Dismissal should be imposed only in extreme circumstances after due consideration of alternative, less drastic sanctions. *Davis v. Speechworks Int'l,* 03-CV-533, 2005 WL 1206894, at *3 (W.D.N.Y. May 20, 2005).

A party seeking sanctions for spoliation of evidence must establish that: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp. v. DeGeorge Fin.*, 306 F.3d 99, 107 (2d Cir. 2002).

The obligation to preserve evidence "arises when a party has notice that the evidence is relevant to litigation – most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Byrnie v. Town of Cromwell Bd. of Ed.*, 243 F.3d 93, 107 (2d Cir. 2001); *Kronisch*, 150 F.3d at 126.

The "culpable state of mind" requirement is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it,

or negligently. *Residential Funding*, 306 F.3d at 108; *Byrnie*, 243 F.3d at 109. As the

Court of Appeals for the Second Circuit explained:

> It makes little difference to the party victimized by the
> destruction of evidence whether that act was done willfully or
> negligently. The adverse inference provides the necessary
> mechanism for restoring the evidentiary balance. The
> inference is adverse to the destroyer not because of any
> finding of moral culpability, but because the risk that the
> evidence would have been detrimental rather than favorable
> should fall on the party responsible for its loss.

*Residential Funding*, 306 F.3d at 108, *quoting Turner v. Hudson Transit Lines, Inc.*, 142

F.R.D. 68, 75 (S.D.N.Y. 1991). "However, where the destruction was negligent rather

than willful, special caution must be exercised to ensure that the inference is

commensurate with information that was reasonably likely to have been contained in

the destroyed evidence." *Turner*, 142 F.R.D. at 77. Generally speaking, "[t]he level of

intentionality goes directly to the degree of severity of any sanction that may be

warranted." *Barsoum v. New York City Housing Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y.

2001).


With respect to the third factor, the Court of Appeals for the Second

Circuit has made clear that something more than would satisfy Rule 401 of the Federal

Rules of Evidence is required. *Residential Funding, 306 F.3d* at 108-09. "Rather, the

party seeking an adverse inference must adduce sufficient evidence from which a

reasonable trier of fact could infer that the destroyed [or unavailable] evidence would

have been of the nature alleged by the party affected by its destruction." *Id.* at 109

(internal quotations omitted). Where the destruction was done in bad faith, or with

gross negligence, the culpability of the party may provide sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party. *Id.* Relevance may also be established through other evidence, such as deposition testimony, demonstrating the nature of the missing evidence. *Id.* However, no sanction is appropriate where "there is no extrinsic evidence tending to show that the destroyed evidence would have been unfavorable to the spoliator." *Turner*, 142 F.R.D. at 77.


**Razor-Type Weapon**

Plaintiff argues that the "mysterious disappearance of the alleged razor, last seen in defendants' possession, has irreparably harmed Mr. Perez in his prosecution of this case, and, therefore, Defendants' Answer should be stricken, or in the alternative, Defendants should be precluded from presenting any evidence of the alleged razor at the trial of this matter." Dkt. #54, ¶ 39. Plaintiff claims prejudice from his inability to test the veracity of defendants' claim that he possessed a razor-type weapon "through inspection and testing of the object he states he never had, through the use of such things as basic as fingerprinting." Dkt. #54, ¶ 38.


Defendants assert that the weapon was destroyed in the ordinary course of events and in accordance with DOCS' policy. Dkt. #59, p.4. Defendants also argue that none of the individual defendants named in this action were responsible for the destruction of the weapon. Dkt. #59, p.6.

-9-

Plaintiff replies that the individual defendants were on notice of their obligation to preserve the weapon by virtue of his grievance, which was filed four days after the incident.  Dkt. #69, ¶ 8.  Specifically, plaintiff asserts that "[t]he fact that an inmate suffered severe injuries because he possessed this alleged weapon should have indicated to Defendants that the weapon must be held to justify their use of excessive force."  Dkt. #69, ¶ 11.

Setting aside the question of whether the individual defendants can be held responsible for the destruction of evidence by a non-party employee of DOCS, the Court concludes that the apparent destruction of the razor-type weapon does not warrant sanctions because production of the weapon would not support his claim that he did not possess a weapon.  Even if the weapon had been produced for fingerprinting, and plaintiff's fingerprints had not been found on the weapon, plaintiff would be in no better position than he is now because the absence of fingerprints does not prove lack of possession.  Accordingly, no sanction is warranted for the failure to produce the alleged weapon.

**Videotape**

Plaintiff argues that defendants' answer should be stricken or, alternatively, the Court should grant a spoliation jury charge due to the defendants' failure to produce the videotape of plaintiff's transport.  Dkt. #54, ¶ 50.  Plaintiff asserts that the "videotape of the transport would be able to substantiate Mr. Perez's claim that he was physically assaulted by Defendants . . . ."  Dkt. #54, ¶ 40.

Defendants argue that the seeming discrepancy between C.O. Dixon's notation that the tape was defective and Captain Bradt's notation that he viewed the tape is irrelevant since the tape would have been recycled, *i.e.*, taped over, in the ordinary course of events, following Captain Bradt's determination that there was nothing unusual on the tape to warrant its preservation.   Dkt. #59, p.7.

Plaintiff replies that the videotape "would have either supported or undermined many of [plaintiff's] claims, including the fact that he was unconscious at the time of transport and was transported by a gurney."  Dkt. #69, ¶ 15.

According to plaintiff's grievance, Sgt. Corcoran's Use of Force Report and Captain Bradt's notations, plaintiff was transported to the facility hospital on a gurney while unconscious  and/or suffering convulsions after a use of force by corrections officers.  Dkt. #54, Exh. C.; Dkt. #54, Exh. E, p.8;  Dkt. #54, Exh. S; Dkt. #60, ¶ 6.  If the extent of plaintiff's injuries was not enough to place DOCS on notice of the potential for future litigation, or at least future investigation, plaintiff filed a grievance, which is a prerequisite to a lawsuit, asserting that defendants had used excessive force upon him within four days of this incident.  Dkt. #54, Exh. C.  In addition, plaintiff alleges in his complaint that he specifically requested the videotape for use in his disciplinary hearing, which ordinarily would be commenced within seven days of the incident, so that he could establish the officers' use of excessive force.  Dkt. #1, p.2; *see* 7 N.Y.C.R.R. § 251-5.1.  Given these allegations, it appears that DOCS was on

notice of the potential for future litigation and the relevance of the videotape, at least with respect to the issue of the amount of force used against plaintiff.

It does not appear, however, that DOCS failure to preserve the videotape can be attributed to any of the defendants in this action.  The video tape, which was recorded by C.O. Reginald Dixon, a non-party to this action, was reviewed in accordance with normal procedure and deemed unremarkable by Captain Bradt, another non-party to this action.  Dkt. #1, p.2; Dkt. #54, Exh. S; Dkt. #60, ¶ 6.  Captain Bradt declares that none of the defendants had any involvement in his review of the video tape or in its apparent destruction.  Dkt. #60, ¶ 9.  Thus, whatever level of culpability can be attributed to DOCS for the destruction of this evidence is attenuated from the individual defendants.   Furthermore, the circumstances of the destruction of the videotape do not suggest an intent to deprive plaintiff of evidence, but merely a failure to recognize the potential importance of the evidence.  At most, this amounts to negligence.

In light of the circumstances presented, the Court does not believe judicial sanctions are warranted for the loss of the video tape.  Plaintiff is free to elicit testimony regarding DOCS' policy of video taping and reviewing inmate transports and the circumstances resulting in the destruction of the video tape of this incident.  Plaintiff may also argue to the jury that the confusion as to the allegedly defective condition of the video tape and its destruction warrants suspicion as to defendants' characterization

of the events which should have been captured on the video tape.  It would go too far, however, for the Court to instruct the jury that an adverse inference is warranted.

**<u>Note</u>**

Plaintiff seeks preclusion of any testimony regarding the alleged inmate note which justified the search of plaintiff's cell because of the defendants' failure to preserve that note.  Dkt. #54, ¶ 55.

Defendants argue that officials at Attica followed their usual procedure in disposing of the note shortly after receiving it.  Dkt. #59, pp.7-8.  Defendants emphasize that the inmate who wrote the note was deposed and corroborated Sgt. Corcoran's deposition testimony that the order to search plaintiff's cell was based upon a note the inmate sent to Sgt. Corcoran stating that plaintiff had asked the inmate to hold a weapon for him.  Dkt. #53, Exh. Q.

Plaintiff replies that although defendants "have diligent records of any evidence that is able to exonerate them . . . every piece of evidence helpful to [plaintiff's] claim has been negligently, if not willfully, destroyed."  Dkt. #69, ¶ 19.

The Court cannot conclude that production of this note would have aided plaintiff's case any way.  Sgt. Corcoran declares that he ordered the search of plaintiff's cell after he received a written note from an inmate telling him that plaintiff had a weapon.  Dkt. #61, ¶ 5.  DOCS produced the inmate for deposition and he testified that

he sent Sgt. Corcoran a note explaining that plaintiff

> had wanted me to hold a weapon for him.  He sent it to me,
> and it was in a sock with a note or something like that,
> saying he wanted me to hold this weapon for him. . . . I sent
> it back.  I didn't want it.  I didn't even look at the weapon.  It
> was like in a sock, and I sent it right back and that was it.

Dkt. #54, Exh. Q.  Thus, plaintiff has proffered no evidence, circumstantial or otherwise,

to suggest that preservation and production of this note would have provided any

evidence relevant to his defense that he never possessed a weapon.


## CONCLUSION

For the foregoing reasons, plaintiff's motion to strike defendants' answer

or to preclude evidence and testimony (Dkt. #53), is **DENIED**.


Pre-trial statements, in strict compliance with Local Rule 16.1(l), shall be

served and filed no later than **Friday, May 26, 2006.**


Trial shall commence on **Tuesday, June 6, 2006 at 10:00 a.m.**


SO ORDERED.


DATED:     Buffalo, New York
           March 30, 2006


                            **S/ H. Kenneth Schroeder, Jr.**
                            **H. KENNETH SCHROEDER, JR.**
                            **United States Magistrate Judge**

-14-